UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JAMES A. SULLIVAN,

      Plaintiff,

v.                     Case No. 8:15-cv-57-T-33AEP

CHRIS NOCCO, in his official
capacity as Sheriff of Pasco
County, Florida, and BRYAN K.
SIKES, individually,

      Defendants.
_____/

**ORDER**

This matter comes before the Court upon consideration of a Motion for Summary Judgment filed by Defendants Chris Nocco, who is sued in his official capacity as Sheriff of Pasco County ("the Sheriff"), and Bryan K. Sikes, a deputy sheriff ("Sikes") (Doc. ## 37, 45). Plaintiff James A. Sullivan ("Sullivan") has responded in opposition (Doc. # 54), and Defendants have filed a reply (Doc. # 58). For the reasons that follow, the Court DENIES the Motion.

**I.**   **Background**

In this Section 1983 action, Sullivan alleges that Sikes used excessive force while conducting a traffic stop. In the instant Motion, Defendants argue that any force was "de

1

minimis" and therefore acceptable under Fourth Amendment standards. The parties offer conflicting accounts of what transpired before Sullivan's eventual arrest for resisting without violence. The Court first reviews Sikes' version of events, followed by Sullivan's account.

On October 9, 2013, Sikes received a radio report of a domestic battery in progress. (Doc. # 39 "Sikes Dep." at 15). Sikes was told that the suspect had fled in a U-Haul moving truck and was possibly heading back to Georgia, driving toward Interstate 75. (Id. at 15, 17). At some point, someone also reported that the domestic dispute involved an argument over guns. (Id. at 15-16).

Sikes began driving eastbound on State Road 52, toward the scene of the domestic dispute, which was in the Lake Jovita community. (Id. at 17-18). As Sikes was driving east, a U-Haul truck passed him heading west, toward Interstate 75. (Id. at 15, 17-18). Sikes turned his vehicle around and activated the lights and siren. (Id. at 18-19). Sikes considered it a high-risk stop because he "was unsure of what actually occurred at the residence, because I did not make it there." (Id. at 19).

The driver of the U-Haul truck, later identified as Sullivan, pulled over. (Id.). Sikes, who was by himself,

2

called the traffic stop in at approximately 10:12 p.m. (<u>Id.</u> at 20). The road was not well-lit and was bordered by cow pastures on one side and a few houses on the other side. (<u>Id.</u>) Sikes got out of the vehicle and headed toward the truck. (<u>Id.</u> at 22).

Sikes approached the truck with his gun in the "low ready" position, pointed toward the ground. (<u>Id.</u> at 22, 24). Sikes "yelled for the driver to put his hands out the window and do not move." (<u>Id.</u> at 22). Sikes did not know who he was dealing with; all he knew was that the suspect had fled the scene of a battery. (<u>Id.</u> at 24).

Sikes had walked halfway down the side of the truck when Sullivan "jumps out of the truck and charges at me, telling me to put my fucking gun away." (<u>Id.</u> at 22, 24, 26-27). Sullivan had something in his hand, but Sikes did not know what it was, and Sullivan "just kept coming in my direction." (<u>Id.</u> at 22-24). Sikes told Sullivan to put his hands on the truck and to stop, but Sullivan continued toward Sikes at a rapid pace. (<u>Id.</u> at 25-26). At the last minute, Sikes realized that Sullivan was holding a Mountain Dew bottle. (<u>Id.</u> at 24, 26). Sikes holstered his gun and slapped the bottle out of Sullivan's hand. (<u>Id.</u> at 24, 27).

Sikes then "locked [Sullivan] into the side of the truck with [Sikes'] forearm against [Sullivan's] neck," and dragged Sullivan to the back of the truck in order to get clear of passing traffic. (Id. at 27-29). Sullivan was trying to pull away, but Sikes "was able to get him on the ground." (Id. at 28). Sikes and Sullivan rolled into a ditch, and Sikes "happened to be on top of him." Sullivan did not swing, punch, or hit Sikes. (Id.). However, Sullivan got up on all fours and was still trying to get away. (Id. at 29).

At that point, a backup deputy arrived. Id. Sikes struck Sullivan twice in the right side of the face, and he and the backup deputy, Timothy Crane, were able to secure Sullivan's hands. (Id. at 29-31). Sikes does not recall saying anything to Sullivan, apart from initially ordering him to put his hands on the truck. (Id. at 30).

According to Sullivan's version of events, he knew that his estranged wife, Karen, had placed a 911 call as he was leaving her father's house in Lake Jovita. (Doc. # 38, "Sullivan Dep." at 76-77). Sullivan and a friend, James Carter ("J.C.") Mason, had traveled from Georgia in order to return household items to Karen and to retrieve Sullivan's valuable gun collection, which comprised approximately 20 handguns and shotguns. (Id. at 69-72). While they were

4

exchanging property, Karen and Sullivan argued over the guns. (Id. at 74-75).   Karen hopped onto Sullivan's pallet jack, which is essentially a small forklift, while Sullivan was driving it.  (Id. at 75).  Sullivan cut the wheel 90 degrees, which put the brakes on, and Karen fell on her backside. (Id.).  Karen reported in the 911 call, a recording of which has been filed with the Court, that Sullivan assaulted her with a pallet jack and that she wanted to press charges. (Doc. # 57).

Approximately five minutes after leaving Lake Jovita, Sullivan passed a deputy, who activated his lights and siren. (Sullivan Dep. at 80).   Sullivan pulled over, and Sikes approached the truck with his gun pointed directly at him. (Id. at 82-83).  Sikes commanded Sullivan to: "Put your hands where I can see them.  And keep your hands where I can see them.  Put your hands out the window."  (Id. at 83).  Sullivan did not know what Karen had told the 911 operator, and he was scared.  (Id. at 84).

Sullivan put both hands out the window, with one hand holding a Mountain Dew bottle.  Sikes told Sullivan to get out of the truck.  (Id.).  Sullivan opened the door from outside the truck, pushing the door open with his forearms and keeping his arms out the door the entire time, because he

wanted Sikes to see his hands.  (Id. at 84-85).  Sullivan then stepped onto the running board, took his arms out of the window, and stepped down onto the pavement.  (Id. at 85).

Sikes told Sullivan to "step to the rear of the truck." Sullivan took about three steps and said, "Officer, please put that gun away.  I'm not going to give you any trouble." (Id.)  Sikes said, "Stop," and Sullivan stopped.  Sikes then holstered his gun, rushed at Sullivan, and slapped the Mountain Dew bottle out of his hand.  Sikes pushed Sullivan, grabbed hold of his clothes, and pushed him to the back of the truck, saying "Stop resisting.  Stop resisting.  Stop resisting."  (Id.)

Sullivan said, "Sir, I'm not resisting you."  (Id.) Sullivan's "arms were to my side just as limp as a noodle. I'm just limp.  The whole upper torso of my body is limp." (Id. at 85-86).  Sikes "was heaving his shoulder into my abdomen, and throwing elbows catching me under here, in my neck pretty much, and punching me in the stomach."  (Id. at 86).  Sikes "was beating my head and back onto the side of that box of that truck, just slamming me against it as hard as he could."  (Id.).  Sullivan estimated that Sikes slammed him against the truck between 6 and 10 times.  (Id. at 88). Sikes said, "You Georgia boys come down here to Florida and

6

beat on women.  We do things a little different down here in Florida." (Id.).

Sullivan started begging Sikes, "Please, please don't hurt me.  I've got to go to California.  I want to see my granddaughter.  I haven't seen my granddaughter.  Please don't hurt me."  (Id. at 89-90).  Sikes grabbed Sullivan's left arm, put him in an "arm bar," dragged him to the back of the truck, and put him in a "helicopter spin."  (Id. at 90).  Sikes released Sullivan mid-spin and Sullivan fell onto the ground.  (Id. at 90-91).

While Sullivan was on his stomach, Sikes came over and put his right knee in the center of Sullivan's back.  (Id. at 92).  Sullivan was begging Sikes to stop, but Sikes, who weighed about 315 pounds at the time, shifted all of his weight to Sullivan's head, forcing it into the grass and dirt. (Id. at 92; Sikes Dep. at 13).

Sullivan turned his head, and Sikes started punching him in the side of his head and neck.  (Sullivan Dep. at 93). Sikes punched Sullivan approximately 15 to 18 times, until Sikes was out of breath.  (Id. at 93-94).  Sikes was also using a "knee spear," kneeing Sullivan in the kidneys and spine.  (Id. at 93).  Sikes kicked Sullivan in the kidneys 5 to 6 times.  (Id. at 94).

7

Sikes told Sullivan to stop resisting about 10 times, but Sullivan could not breathe with Sikes' weight on top of him.  (Id. at 94-95).  Sullivan, who had a pre-existing rib injury, "was just trying to position myself enough to get this sternum off the ground and get some air in them lungs." (Id. at 11, 95).  Sullivan maintains that he did not refuse to hold out his hands and that he was "consciously focused on staying as limp and relaxed as I possibly could."  (Id. at 95-96).

While Sullivan was on the ground, he saw a red dot from a laser shining on the grass, approximately 10 or 14 inches from his face.  (Id. at 96).  A second deputy approached Sullivan, pressed something against the base of his skull and said, "If you don't be still, I'm going to tase you."  (Id. at 96-97).  Sullivan said, "Do you what you have to do.  It will feel better than what he's doing to me."  (Id. at 97). Sullivan maintains that Sikes "was killing me.  I couldn't breathe."  (Id.).

After Sullivan's remark to the second deputy, Sikes stopped beating Sullivan and handcuffed him.  (Id. at 96). Sullivan was unable to get up for about five minutes because he was exhausted from being out of oxygen.  (Id. at 98).

8

Sullivan asked the deputies for assistance to get up, and one said, "Get your own ass up." (Id. at 99).

A few minutes later, Sikes' shift supervisor, Sergeant Michael Mielke, arrived at the scene. (Id. at 101; Sikes Dep. at 10). Sullivan reported what Sikes did, but Mielke said, "Look, I spoke with Sikes. I'm not going to tolerate anybody giving my officers a hard time out here. I'm going to back him up." (Sullivan Dep. at 101). When Mielke asked Sullivan what happened with Karen, Sullivan related his version of events. (Id. at 103). Mielke left to talk to Karen. (Id.). Approximately 30 minutes later, Mielke returned and told Sullivan that he was not going to be charged with domestic violence, but he would be charged with resisting arrest. (Id. at 103, 106). That charge was ultimately dismissed by the prosecutor. (Id. at 112-13).

Sullivan and Sikes each produce a witness who confirms, in part, their accounts. Sullivan's friend, J.C. Mason, remained in the passenger seat of the truck throughout the incident. (Doc. # 41, "Mason Dep." at 18, 29). According to Mason, Sikes "had his gun pulled" as he approached the truck, but he "was holding it out" rather than pointing it at Sullivan. (Id. at 19-20). Although Mason did not see the initial altercation, he could feel the 26-foot truck rocking

for about 30 to 45 seconds. (Id. at 18, 23-24; Sullivan Dep. at 86). Mason then saw Sikes and Sullivan, through the passenger-side rearview mirror, rolling around all over the ground. (Mason Dep. at 18, 25-26). Sullivan was on his stomach, and Sikes was on top of him. (Id. at 26). Mason did not remember seeing Sikes hit Sullivan. (Id. at 27).

Timothy Crane, the backup deputy, came upon Sullivan and Sikes "physically fighting" and recalled that they went to the ground at the same time. (Doc. # 40, "Crane Dep." at 17). Crane did not recall whether Sikes was on top of Sullivan. (Id. at 18-19). Crane heard yelling and cursing and Sikes telling Sullivan to stop resisting. (Id.). As Crane got closer, Sikes told Sullivan to place his hands behind his back, but Sullivan did not comply. (Id. at 19).

Crane then threatened to use his Taser if Sullivan did not put his hands behind his back. (Id. at 19-20). Crane felt that Sullivan's "aggression level was rising and he was also squirming, flailing his arms and legs, and he repeatedly attempted to stand up and escape Deputy Sikes' grasp." (Id. at 20). Both Crane and Sikes attempted to get Sullivan's hands behind his back, and it took them a few minutes to handcuff Sullivan. (Id. at 20-22). Crane saw Sikes hit

10

Sullivan in the face once, but Crane did not see Sikes use his knees. (Id. at 20-21).

The day after the incident, Sullivan went to the emergency room complaining of neck and back pain. (Sullivan Dep. at 114). According to Sullivan, the doctor concluded "that I was bruised up pretty good" although nothing was broken. (Id.). Sullivan remained isolated for two or three days after the incident, due to depression or shock. (Id. at 114-15).

Both sides submit a medical expert report addressing the extent and cause of Sullivan's injuries. Defendants' expert, Michael Karr, M.D., recounts that Plaintiff was diagnosed at the emergency room with a contusion of the right jaw, neck contusion, and low back pain. (Doc. # 37-2 at 4). Dr. Karr notes that lumbar x-rays showed no fractures, a CT scan of the brain showed no acute changes, a CT scan of the cervical spine showed degenerative changes with no soft tissue swelling, and a CT scan of the maxillofacial area showed no fractures and no fluid in the sinuses. A head examination revealed no evidence of trauma, a neck examination revealed decreased and limited range of motion, and a lumbar examination noted some spasms. (Id.)

Dr. Karr opines that Sullivan's ongoing complaints are largely due to pre-existing and degenerative changes. (Id. at 8-11). By contrast, Sullivan's expert, Craig Lichtblau, M.D., opines that Sullivan suffers from chronic neck pain and headaches that are a direct result of the altercation with Sikes on October 9, 2013. (Doc. # 54-1 at 10).

Sullivan filed this action on January 12, 2015. (Doc. # 1). Sullivan includes two counts against Sikes: a claim pursuant to 42 U.S.C. § 1983, alleging that Sikes used excessive force in violation of the Fourth Amendment (Count V) and a state-law claim for malicious prosecution (Count IV). Sullivan also asserts three state-law claims against the Sheriff, premised on vicarious liability: false arrest or imprisonment (Count I), excessive force constituting battery (Count II), and negligence (Count III).

After the Sheriff moved to dismiss the negligence claim in Count III, Sullivan voluntarily dismissed Count III. (Doc. ## 4, 17-18). Defendants now move for summary judgment on the remaining counts. (Doc. # 37). The Motion is ripe for review.

## II.  **Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and

the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)).  A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997).  The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial.  Hickson Corp. v. N. Crossarm Co., Inc., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue

13

for trial." <u>Jeffery v. Sarasota White Sox, Inc.</u>, 64 F.3d 590, 593-94 (11th Cir. 1995) (citing <u>Celotex</u>, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor. <u>Shotz v. City of Plantation, Fla.</u>, 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. <u>Samples ex rel. Samples v. City of Atlanta</u>, 846 F.2d 1328, 1330 (11th Cir. 1988) (citing <u>Augusta Iron & Steel Works, Inc. v. Emp'rs Ins. of Wausau</u>, 835 F.2d 855, 856 (11th Cir. 1988)). However, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. <u>Morris v. Ross</u>, 663 F.2d 1032, 1034 (11th Cir. 1981).

## III. <u>Analysis</u>

### A.   <u>Section 1983 Claim</u>

Sullivan bases this Court's federal-question jurisdiction on the excessive-force claim brought pursuant to

14

42 U.S.C. § 1983, which creates a cause of action for the deprivation of rights, privileges, or immunities secured by the federal Constitution or federal law, by any person acting under color of state law. Arrington v. Cobb County, 139 F.3d 865, 872 (11th Cir. 1998). To prevail on a claim under Section 1983, a plaintiff must establish that: (1) he has been deprived of a right, privilege, or immunity secured by the Constitution or federal law, and (2) the deprivation occurred under color of state law. Id.; Butler v. Sheriff of Palm Beach Cty., 685 F.3d 1261, 1265-66 (11th Cir. 2012).

Sikes asserts qualified immunity. "Qualified immunity affords complete protection to government officials sued individually," Terrell v. Smith, 668 F.3d 1244, 1250 (11th Cir. 2012), except in cases where "the law preexisting the defendant official's supposedly wrongful act was already established to such a high degree that every objectively reasonable official standing in the defendant's place would be on notice that what the defendant official was doing would be clearly unlawful given the circumstances." Pace v. Capobianco, 283 F.3d 1275, 1282 (11th Cir. 2002). Qualified immunity "protect[s] from suit 'all but the plainly incompetent or one who is knowingly violating the federal law.'" Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002)

15

(quoting Willingham v. Loughnan, 261 F.3d 1178, 1187 (11th Cir. 2001)).

In order to receive qualified immunity, "the official must first establish that he was performing a 'discretionary function' at the time the alleged violation of federal law occurred." Crosby v. Monroe County, 394 F.3d 1328, 1332 (11th Cir. 2004) (quoting Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1263 (11th Cir. 2004)).  In this case, Sullivan does not dispute that Sikes was performing a discretionary function when he conducted the traffic stop and arrest.

As a result, the burden shifts to Sullivan to establish that Sikes is not entitled to qualified immunity.  Id.  This Court follows a two-part analysis in determining whether qualified immunity applies.  Vinyard v. Wilson, 311 F.3d at 1340, 1346 (11th Cir. 2002).  The first part asks "whether [the] plaintiff's allegations, if true, establish a constitutional violation." Id. (quoting Hope v. Pelzer, 536 U.S. 730, 736 (2002)) (internal quotation marks omitted) (alteration in original).  The second part asks "whether the right was clearly established." Id. (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001)) (internal quotation marks omitted). Courts have discretion to decide the order in which to address the two parts. Pearson v. Callahan, 555 U.S. 223, 236 (2009).

16

Nevertheless, "[b]oth elements must be satisfied for an official to lose qualified immunity." Grider v. City of Auburn, 618 F.3d 1240, 1254 (11th Cir. 2010).

### 1. Constitutional violation

Under the first prong, Sullivan must establish that qualified immunity is not appropriate because the facts, when viewed in the light most favorable to Sullivan, show that Sikes violated a constitutional right. Mercado v. City of Orlando, 407 F.3d 1152, 1156 (11th Cir. 2005). Critically, the Court "cannot simply accept the officer's subjective version of events, but rather must reconstruct the event in the light most favorable to the non-moving party and determine whether the officer's use of force was excessive under those circumstances." Fils v. City of Aventura, 647 F.3d 1272, 1288 (11th Cir. 2011).

The Fourth Amendment's guarantee of "freedom from unreasonable searches and seizures includes the right to be free from excessive force during a criminal apprehension." Mercado, 407 F.3d at 1156. The inquiry into whether a Fourth Amendment violation has occurred "requires a balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'"

Tolan v. Cotton, 134 S.Ct. 1861, 1865 (2015) (quoting Tennessee v. Garner, 471 U.S. 1, 8 (1985)). "The 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officer's actions are 'objectively reasonable' in light of the facts and circumstances confronting him, without regard to his underlying intent or motivation." Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1248 (11th Cir. 2004) (quoting Graham v. Connor, 490 U.S. 386, 397 (1989)).

In determining reasonableness, a court "look[s] at the fact pattern," McCullough v. Antolini, 559 F.3d 1201, 1206 (11th Cir. 2009), as described by the plaintiff, Fils, 647 F.3d at 1288, "from the perspective of a reasonable officer on the scene with knowledge of the attendant circumstances and facts, and balance[s] the risk of bodily harm to the suspect against the gravity of the threat the officer sought to eliminate." McCullough, 559 F.3d at 1206. The reasonableness of the force used must not be judged "with the 20/20 vision of hindsight." Id. (quoting Graham, 490 U.S. at 396). A Court's "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of

18

force that is necessary in a particular situation." Id. (quoting Graham, 490 U.S. at 396-97). Because "[t]he constitutional test for excessive force is necessarily fact specific," Terrell, 668 F.3d at 1251 (quoting McCullough, 559 F.3d at 1206) (alteration in original), this Court "must still slosh [its] way through the factbound morass of 'reasonableness.'" Id. (quoting Scott v. Harris, 550 U.S. 372, 383 (2007)).

In conducting this inquiry, the Court evaluates "(1) the need for the application of force, (2) the relationship between the need and amount of force used, and (3) the extent of the injury inflicted." Vinyard, 311 F.3d at 1347 (quoting Lee, 284 F.3d at 1197-98). The need-for-force criterion "is measured by the severity of the crime, the danger to the officer, and the risk of flight." Lee, 284 F.3d at 1198. "[T]he force used by a police officer . . . must be reasonably proportionate to the need for that force." Id.

Sikes premises his Motion on a line of cases holding that "the application of de minimis force, without more, will not support a claim for excessive force in violation of the Fourth Amendment." Nolin v. Isbell, 207 F.3d 1253, 1257 (11th Cir. 2000). Because "the typical arrest involves some force and injury," Reese v. Herbert, 527 F.3d 1253, 1272 (11th Cir.

19

2008), a "minimal amount of force and injury . . . will not defeat an officer's qualified immunity." Nolin, 207 F.3d at 1258; Lee, 284 F.3d at 1200 ("the use of force is an expected, necessary part of a law enforcement officer's task of subduing and securing individuals suspected of committing crimes").

In response, Sullivan points out that "even de minimis force will violate the Fourth Amendment if the officer is not entitled to arrest or detain the suspect." Reese, 527 F.3d at 1272. Sullivan argues, without citation to any record evidence, that "the record does not establish Sikes was even sure of the reason for pulling Plaintiff over." (Doc. # 54 at 6). To the contrary, Sikes testified that he stopped Sullivan's U-Haul truck on State Road 52 shortly after learning that a U-Haul truck was fleeing the scene of a domestic battery, possibly via State Road 52. (Sikes Dep. at 15-19). Absent a more focused challenge by Sullivan, the Court declines to hold that Sikes lacked reasonable suspicion to conduct an investigatory stop. See United States v. McCall, 563 F. App'x 696, 701 (11th Cir. 2014) (holding that officers had reasonable suspicion to stop a vehicle based on description provided in a 911 call).

Sullivan more persuasively argues that the force allegedly used in this case exceeded "de minimis" force. The

20

de-minimis-force cases, in which qualified immunity is granted, typically involve a minimal amount of force that results in minor injury.[1]  In this case, Sullivan testified that Sikes used considerably more force.  Sullivan maintains that Sikes "beat[] my head and back onto the side of that box of that truck, just slamming me against it as hard as he could," approximately 6 to 10 times.  (Sullivan Dep. at 86).  Mason confirmed that the 26-foot truck rocked back and forth for 30 to 45 seconds due to the impact of the blows.  (Mason Dep. at 18, 23-24; Sullivan Dep. at 86).  Although Sullivan begged Sikes to stop hurting him, Sikes spun Sullivan onto the ground, kneed him in the back, and used his 315 pounds of

---

[1] E.g., Croom v. Balkwill, 645 F.3d 1240, 1252-53 (11th Cir. 2011) (deputy pushed elderly plaintiff to the ground from a squatting position and held plaintiff there with a foot or knee in the back for up to ten minutes); Durruthy v. Pastor, 351 F.3d 1080, 1094 (11th Cir. 2003) (officers forced plaintiff to the ground and kneed him in the back while handcuffing him); Nolin, 207 F.3d at 1258 n.4 (officer grabbed plaintiff and shoved him a few feet against a vehicle, pushed his knee into plaintiff's back and plaintiff's head against the van, and searched plaintiff's groin in an uncomfortable manner, causing minor bruising); Jones v. City of Dothan, 121 F.3d 1456, 1460 (11th Cir. 1997) (officers "slammed" plaintiff against the wall, kicked his legs apart, and required him to raise his arms above his head, causing minor injuries); Post v. City of Fort Lauderdale, 7 F.3d 1552, 1556, 1559-60 (11th Cir. 1993) (officer put plaintiff in a chokehold for five seconds before handcuffing him and pushed plaintiff against the wall when he kept speaking after being told to stop).

weight to push Sullivan's face into the grass and dirt. (Sullivan Dep. at 89-90, 92-93; Sikes Dep. at 13). Sikes then punched Sullivan in the head and neck 15 to 18 times, until Sikes was out of breath, and kicked Sullivan in the kidneys 5 to 6 times. (Sullivan Dep. at 93-94).

Sikes urges the Court to discount Sullivan's version of the beating as blatantly contradicted by other record evidence. (Doc. # 37 at 18-19). Sikes argues that Sullivan's testimony is not credible given that Sullivan did not ask for medical assistance at the scene, and the emergency room physician did not diagnose Sullivan with any serious injury. Sikes also points out that Sullivan's booking photo, which Defendants attach to the Motion (Doc. # 37-1), depicts no significant injuries. Sikes further argues that Crane's testimony and Mason's testimony confirms that Sikes used appropriate force.

In Scott v. Harris, the case on which Sikes relies, the Supreme Court rejected the plaintiff's version of events because it was "utterly discredited" by a video tape from the scene. 550 U.S. at 380. In contrast to the "definitive" evidence provided by the video tape, Sikes' evidence is largely circumstantial. Skelly v. Okaloosa Cty. Bd. of Cty. Comm'rs, 415 F. App'x 153, 155 (11th Cir. 2011) (explaining

22

that circumstantial evidence was not akin to the definitive videotape evidence relied on in Scott). The fact that Sullivan did not request medical treatment at the scene may suggest that he did not sustain serious injuries, but a factfinder could also infer, among under explanations, that Sullivan's injuries were not immediately apparent or that Sullivan's delay in seeking treatment was due to shock. The fact that the booking photo does not depict a serious injury may suggest that Sullivan was not seriously injured, or it may suggest that the injuries were to areas other than Sullivan's face. Finally, the emergency room physician did diagnose Sullivan with a right jaw contusion, a neck contusion, and low back pain, confirming that some injuries were inflicted in the areas that Sullivan reported being struck. (Doc. # 37-2 at 4).

The Court recognizes that the "facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case." Galvez v. Bruce, 552 F.3d 1238, 1244 n.5 (11th Cir. 2008) (internal quotation marks omitted). In this case, however, Sullivan's testimony is not so "inherently incredible" that this Court is required to reject it. Perez v. Suszczynski, 809 F.3d 1213, 1221 (11th Cir. 2016).

23

Accepting Sullivan's testimony, the Court addresses the controlling question: whether Sikes' actions were "objectively reasonable in light of the facts and circumstances confronting him, without regard to his underlying intent or motivation." Kesinger, 381 F.3d at 1248 (internal quotation marks omitted). After weighing the relevant factors——an undertaking that Sikes does not attempt——the Court concludes that Sikes' use of force was constitutionally excessive.

The Court first considers the need for force, which, in turn, requires consideration of the severity of the crime at issue, the danger to Sikes, and the risk of flight. Lee, 284 F.3d at 1198. Initially, the crime at issue was a domestic battery, which is a more serious offense than a simple traffic infraction or other non-violent offense. Because Sikes was confronting a potential battery suspect, the encounter also posed a heightened degree of danger to Sikes, as he testified. (Sikes Dep. at 19, 24). Increasing Sikes' exposure, he was conducting the traffic stop alone, on a relatively rural stretch of road that was not well-lit. Although Sullivan had pulled over without incident, a risk of flight existed as long as Sullivan remained unsecured. Based on all of these

24

facts, Sikes was entitled to use some degree of force.[2]  See,
e.g., Courson v. McMillian, 939 F.2d 1479, 1494-95 (11th Cir.
1991) (holding that, under certain circumstances, "this
circuit condoned officers' having drawn weapons when
approaching and holding individuals for an investigatory
stop").

The next question is whether Sikes' use of force was
proportionate to the need.  Lee, 284 F.3d at 1198.  On this
issue, Sullivan's testimony that he was compliant with Sikes'
orders, and was not physically resisting, is critical.  The
Fourth Amendment constrains the use of "gratuitous" force,
which includes "harming a suspect after that suspect is
compliant, cooperative, under control, or otherwise subdued."
Merricks v. Adkisson, 785 F.3d 553, 563 (11th Cir. 2015);
Rachel v. City of Mobile, 112 F. Supp. 3d 1263, 1284-87 (S.D.

---

[2]  Sikes also testified that "[a]t some point in time," he
heard information about "an argument over guns," but he did
not remember if that information was received in the 911 call,
or from an officer at the scene.  (Sikes Dep. at 16-17).  As
Sullivan observes, Sikes' arrest report did not mention guns,
and Karen's 911 call did not mention guns.  (Doc. # 39 at 66;
Doc. # 57).  Based on these facts and Sikes' imprecise
deposition testimony, the Court takes the inference most
favorable to Sullivan, which is that Sikes did not know about
the guns at the time he conducted the traffic stop and the
alleged beating.  Even if Sikes did possess such knowledge,
however, it would not alter the result of the excessive-force
calculus, for the reasons discussed below.

Ala. 2015) (surveying case law and holding that gratuitous force used against a non-resisting and unhandcuffed suspect was excessive), <u>aff'd</u>, 633 F. App'x 784 (11th Cir. 2016).

Here, Sullivan testified that he pulled over when he saw Sikes' lights and sirens. (Sullivan Dep. at 82).  In response to Sikes' commands, Sullivan put his hands out the window, where Sikes could see them.  (<u>Id.</u> at 83-84).  Sullivan got out of the truck when Sikes told him to, he walked to the back of the truck when Sikes told him to, and he stopped walking when Sikes told him to.  (<u>Id.</u> at 84-85).  Sullivan maintains that his arms were "limp as a noodle" and his whole upper torso was limp.  (<u>Id.</u> at 85-86).  When Sullivan was on the ground, he did not refuse to hold out his hands and was focused "on staying as limp and relaxed as I possibly could." (<u>Id.</u> at 95-96).  Sikes agrees that Sullivan did not swing, punch, or hit him.  (Sikes Dep. at 28).

Although Sikes does not raise the argument, the Court notes that even Sullivan's account indicates that he was not entirely submissive to Sikes' authority.  Sullivan admits that he initially asked Sikes to put his gun away, telling Sikes that he was not going to make any trouble.  (Sullivan Dep. at 85).  At one point, Sullivan also said, "Sir, I'm not resisting you." (<u>Id.</u>).  Sullivan further acknowledged that,

26

with Sikes' 315 pounds on top of him, he tried "to position myself enough to get this sternum off the ground and get some air in them lungs." (Id. at 95). Nonetheless, considered in the context of the overall encounter, Sullivan's comments to Sikes and his movement while on the ground may be viewed as "minor transgressions" when compared to the amount of force that Sikes exerted. Saunders v. Duke, 766 F.3d 1262, 1269-70 (11th Cir. 2014) (holding that plaintiff's "minor transgression" of lifting his head up and off of a hot pavement did not necessarily justify the alleged degree of force); accord Hawkins v. Carmean, 562 F. App'x 740, 43-744 (11th Cir. 2014) (affirming denial of qualified immunity where plaintiff did not immediately exit her vehicle, pushed officer's hands away, and swatted her hand in officer's direction); Priester v. City of Riviera Beach, 208 F.3d 919, 927 (11th Cir. 2000) (affirming denial of qualified immunity where the plaintiff kicked an attacking police dog).

The Court also notes, under the third factor in the reasonableness calculus, that Sullivan suffered no immediate, severe injury. Lee, 284 F.3d at 1198. Sullivan did, however, receive subsequent medical treatment, which revealed contusions and lumbar spasms. Sullivan's medical expert, Dr. Lichtblau, has also opined that Sullivan suffers from ongoing

27

neck pain and headaches as a result of the incident. (Doc. # 54-1 at 10). Moreover, "objectively unreasonable force does not become reasonable simply because the fortuity of the circumstances protected the plaintiff from suffering more severe physical harm." Lee, 284 F.3d at 1200. The core judicial inquiry is "the nature of the force." Saunders, 766 F.3d at 1270.

Based on the foregoing, the Court finds that the nature of the force was excessive. Sullivan's version of events reveals that Sikes engaged in a violent, prolonged beating, despite the fact that Sullivan was compliant, "limp as a noodle," begged Sikes to stop, did not fight back, and did not attempt to flee. Even assuming that it was necessary for Sikes to slam Sullivan repeatedly against the side of the truck to initially restrain him, the record reveals no justification for the additional beating that Sikes delivered, including the 15 to 18 punches to Sullivan's head and neck, and the 5 or 6 kicks to the kidneys. See Edwards v. Shanley, 666 F.3d 1289, 1295-96 (11th Cir. 2012) (explaining that dog attack became excessive when it was allowed to continue for five to seven minutes while the plaintiff was pleading to surrender); Walker v. City of Riviera Beach, 212 F. App'x 835, 839 (11th Cir. 2006) (holding

28

that officer unreasonably struck plaintiff's head with a gun).

The Court is mindful that the reasonableness of Sikes' use of force used must not be judged "with the 20/20 vision of hindsight," and the inquiry must take into account the need to make "to make split-second judgments——in circumstances that are tense, uncertain, and rapidly evolving." McCullough, 559 F.3d at 1206. Nonetheless, under Sullivan's version of events, no threat was presented that would justify the degree of force used by Sikes.

## 2. Clearly-established law

The remaining issue is whether Sikes violated a right that was "clearly-established" at the time of the alleged misconduct. "The violation of a constitutional right is clearly established if a reasonable official would understand that his conduct violates that right." Bussey-Morice v. Gomez, 587 F. App'x 621, 627 (11th Cir. 2014) (citing Coffin v. Brandau, 642 F.3d 999, 1013 (11th Cir. 2011) (en banc)). "'[T]he salient question . . . is whether the state of the law' at the time of an incident provided 'fair warning' to the defendants 'that their alleged [conduct] was unconstitutional.'" Tolan, 134 S.Ct. at 1866 (quoting Hope, 536 U.S. at 741) (alterations in original). "[T]he touchstone

29

of qualified immunity is notice." Holmes v. Kucynda, 321 F.3d 1069, 1078 (11th Cir. 2003).

The Eleventh Circuit has established two methods for determining whether the right in question was clearly established at the time of the alleged misconduct. Fils, 647 F.3d at 1291. Under the first, "decisions of the United States Supreme Court, the United States Court of Appeals for the Eleventh Circuit, and the highest court of the pertinent state (here, the Supreme Court of Florida) can clearly establish the law." McClish v. Nugent, 483 F.3d 1231, 1237 (11th Cir. 2007) (citing Marsh v. Butler County, 268 F.3d 1014, 1032 n.10 (11th Cir. 2001) (en banc)). The Court looks at the relevant case law at the time of the violation; the right in question is "clearly established if 'a concrete factual context [exists] so as to make it obvious to a reasonable government actor that his actions violate federal law.'" Fils, 647 F.3d at 1291 (quoting Hadley v. Gutierrez, 526 F.3d 1324, 1333 (11th Cir. 2008)) (alteration in original). The cases need not be "materially similar" to the officer's conduct. Id. "But, where the law is stated in broad propositions, 'a very high degree of prior factual particularity may be necessary.'" Id. (quoting Hope, 536 U.S. at 740-41).

30

The second method, termed the obvious-clarity method, "involves evaluating the officer's conduct and deciding whether the officer's conduct lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to [the officer], notwithstanding the law of fact-specific case law on point." Bussey-Morice, 587 F. App'x at 627 (quoting Fils, 647 F.3d at 1291) (alteration in original) (citation and internal quotation marks omitted). This method "recognizes that although concrete facts are typically necessary to provide an officer with notice of 'the hazy border between excessive and acceptable force,' when an officer's conduct is 'so outrageous that it clearly goes "so far beyond" these borders, qualified immunity will not protect him . . . .'" Id. (quoting Fils, 647 F.3d at 1291-92). The obvious-clarity method "offers a narrow exception to the general rule that only case law and specific factual scenarios can clearly establish a constitutional violation," however, it "is a difficult one to meet." Id. at 627-28. Nevertheless, "qualified immunity will be denied if the preexisting law '[made] it obvious that the defendant's acts violated the plaintiff's rights in the specific set of circumstances at issue.'" Montero v. Nanlal, 597 F. App'x 1021, 1026 (11th

Cir. 2014) (quoting Youmans v. Gagnon, 626 F.3d 557, 563 (11th Cir. 2010)).

Prior to October 9, 2013, published Eleventh Circuit precedent, including the 2011 decision in Fils v. City of Aventura, established that "unprovoked force against a non-hostile and non—violent suspect who has not disobeyed instructions violates that suspect's rights under the Fourth Amendment," even if the suspect is not yet handcuffed.  647 F.3d at 1289; accord Edwards, 666 F.3d at 1296.  Although Fils involved crimes that were less serious than domestic battery, the dispositive "factual context" was the fact that the officer used significant force against a non-resisting and compliant suspect.  Fils, 647 F.3d at 1288-91 ("But the facts we must accept show that Maurice was not violent. He did not disobey orders. He did not resist arrest. And he posed no risk to the Defendants or anyone else at the club. Therefore, [the officers'] tasing violated Maurice's Fourth Amendment rights."); accord Edwards, 666 F.3d at 1296 ("Because Edwards was begging to surrender, and because Officer Shanley could safely give effect to that surrender, the further infliction of pain was gratuitous and sadistic. This the Constitution does not tolerate.").  As a result, Fils provided Sikes with "fair warning" that a violent,

32

prolonged beating of a non-resisting and compliant suspect was constitutionally excessive.  <u>Tolan</u>, 134 S.Ct. at 1866.

In the alternative, the Court finds that, even absent clearly-established precedent, the constitutional violation is obvious.  Any officer would realize that the prolonged and violent beating of a non-resisting suspect——in short, a gratuitous display of force——is objectively unreasonable under Fourth Amendment standards.  <u>See</u>, <u>e.g.</u>, <u>Fils</u>, 647 F.3d at 1292 ("The facts as we must accept them show that Maurice showed no hostility to the Defendants, did not disobey any orders, and did not make any menacing gestures. Assuming these facts, no reasonable officer could ever believe that it was appropriate to shoot his taser probes into Maurice and shock him."); <u>Reese</u>, 527 F.3d at 1274 ("Reese's version of the facts demonstrates a beating that "falls within 'the core of what the Fourth Amendment prohibits': a severe beating of a restrained, non-resisting suspect"); <u>Walker</u>, 212 F. App'x at 839 (holding that "an unwarranted pistol whip lies at the core of what the Fourth Amendment prohibits").

Based on the foregoing, Sikes' Motion for Summary Judgment is DENIED on the Section 1983 claim for excessive force (Count V).

33

B.   <u>State-Law Claims</u>

1.   **Battery**

In Count II of the Complaint, Sullivan alleges that the Sheriff is vicariously liable for Sikes' alleged battery and excessive use of force, under Florida law. (Doc. # 1 at ¶¶ 36-42). In Florida, "[a] battery claim for excessive force is analyzed by focusing upon whether the amount of force used was reasonable under the circumstances." <u>City of Miami v. Sanders</u>, 672 So. 2d 46, 47 (Fla. 3d DCA 1996). Pursuant to Fla. Stat. § 776.051(1), a law enforcement officer is justified in using "any force" that "he or she reasonably believes to be necessary to defend himself . . . from bodily harm while making [an] arrest." This statutory provision provides a complete defense to an excessive-force claim. <u>City of Miami</u>, 672 So. 2d at 47.

In the Motion, the Sheriff adopts the arguments advanced by Sikes in connection with the Section 1983 excessive-force claim. (Doc. # 37 at 21). For the reasons explained above, the Court finds that, under Sullivan's version of events, the force used by Sikes was not reasonable. The Sheriff raises no other argument with respect to the state-law claim for excessive force. Accordingly, the Motion for Summary Judgment is DENIED as to Count II.

## 2.   Malicious prosecution

In Count IV, Sullivan brings a claim for malicious prosecution against Sikes individually, based on his arrest of Sullivan for resisting arrest without violence. (Doc. # 1 at ¶¶ 47-54).   Under Florida law, a claim for malicious prosecution requires a showing that:

> (1) an original criminal or civil judicial proceeding against the present plaintiff was commenced or continued; (2) the present defendant was the legal cause of the original proceeding against the present plaintiff as the defendant in the original proceeding; (3) the termination of the original proceeding constituted a bona fide termination of that proceeding in favor of the present plaintiff; (4) there was an absence of probable cause for the original proceeding; (5) there was malice on the part of the present defendant; and (6) the plaintiff suffered damage as a result of the original proceeding.

Alamo Rent-A-Car, Inc. v. Mancusi, 632 So. 2d 1352, 1355 (Fla. 1994).

Sikes first argues that Sullivan is unable to demonstrate the fourth element: the absence of probable cause for the original proceeding.   Sikes conclusorily asserts that, "based on the argument and observation hereinabove in subsection (c), there is no genuine issue of material fact as to the existence of probable cause."   (Doc. # 37 at 23). "Subsection (c)" consists of the quoted sentence, preceded by two sentences setting forth the elements of a malicious

35

prosecution claim. (Id. at 22-23). No other section of Defendants' Motion addresses whether Sikes had probable cause to arrest Sullivan for resisting arrest without violence. Sikes does not identify the statutory basis for the offense, he does not discuss the elements of the offense under Florida law, and he makes no attempt to evaluate those elements under the facts of this case. The reply brief is similarly deficient.

Sikes, as the party moving for summary judgment, must point to specific record evidence demonstrating that there are no genuine issues of material fact for trial. Hickson Corp., 357 F.3d at 1260. Sikes' vague argument fails to discharge this initial burden.

Even if Sikes had discharged his burden, factual issues preclude summary judgment. Section 843.02 of the Florida Statutes prohibits resisting arrest without violence as follows: "Whoever shall resist, obstruct, or oppose any officer . . . in the execution of legal process or in the lawful execution of any legal duty, without offering or doing violence to the person of the officer, shall be guilty of a misdemeanor[.]" A violation of Fla. Stat. § 843.02 occurs if: (1) a law enforcement officer issues a lawful order to the defendant to stop, (2) the defendant has knowledge of the

36

order and that it is issued by a law enforcement officer, and (3) the defendant refuses to obey the order.  C.E.L. v. State, 995 So. 2d 558, 561 (Fla. 2d DCA 2008); see also Wilkerson v. State, 556 So. 2d 453, 455-56 (Fla. 1st DCA 1990) ("Although a person's speech may at times be implicated incidentally in the enforcement of this statute, its plainly legitimate sweep is to reach conduct that physically obstructs or opposes an officer in the performance of lawful duties.").

As detailed above, Sullivan maintains that he complied with Sikes' orders and offered no physical resistance.  While a factfinder may ultimately discredit Sullivan's testimony, at this juncture, Sullivan sufficiently demonstrates the absence of probable cause for his arrest on the charge of resisting without violence.

Sikes alternatively argues that he is entitled to statutory immunity on the malicious-prosecution claim. Pursuant to Fla. Stat. § 768.28(9)(a), an employee of the state or its subdivisions may be sued in tort only if the employee acted with bad faith, malicious purpose, or wanton and willful disregard of human rights, safety, or property. Sikes asserts, again only conclusorily, that there is no evidence that he acted with the requisite malice.  (Doc. # 37 at 24).

37

In response, Sullivan contends that Sikes deliberately manufactured the charge of resisting without violence to justify his use of force, once the domestic battery charged was revealed to be unsubstantiated. (Doc. # 54 at 12). Although Sullivan's argument requires an inference, that inference is supported by other record evidence, including Sikes' unreasonable use of force (according to Sullivan's version of events), and Sergeant Mielke's assessment on the scene that no charge would be brought for domestic battery but that he would "back [Sikes] up." (Sullivan Dep. at 101, 103). In addition, Sullivan testified that Sikes exhibited animosity toward him, stating during their altercation: "You Georgia boys come down here to Florida and beat on women. We do things a little different down here in Florida." (Id. at 88).

On these facts, and without a more specific challenge from Sikes, the Court finds that a fact issue exists as to whether Sikes initiated the charge against Sullivan with a malicious purpose. See Johnson v. Sackett, 793 So. 2d 20, 25 (Fla. 2d DCA 2001) (holding that question of whether caseworker acted with malicious purpose was not appropriate for summary judgment). The Motion for Summary judgment is therefore DENIED as to Count IV.

### 3.   False arrest

In Count I, Sullivan asserts a state-law claim against the Sheriff for false arrest.   (Doc. # 1 at ¶¶ 30-35). Although Defendants' Motion for Summary Judgment initially states that they move for summary judgment on each count (Doc. # 37 at 2), Defendants include no briefing on the false-arrest claim.   By omitting any argument specific to this claim, Defendants fail to comply with Local Rule 3.01(a), which requires a motion to include "a statement of the basis for the request, and a memorandum of legal authority in support of the request."   Defendants also fail to discharge their burden as the party moving for summary judgment. Hickson Corp., 357 F.3d at 1260.

To the extent that the Sheriff intended to argue that probable cause existed for Sullivan's arrest, which is an affirmative defense to a false-arrest claim, Metropolitan Dade County v. Norton, 543 So. 2d 1301, 1302 (Fla. 1st DCA 1989), the Motion is due to be denied.   As discussed in the preceding section, Sullivan points to sufficient record evidence to allow a factfinder to conclude that he was arrested without probable cause.

Accordingly, the Motion for Summary Judgment is DENIED as to Count I.

39

IV.   Conclusion

Based on the foregoing, it is

**ORDERED, ADJUDGED,** and **DECREED** that Defendants' Motion for Summary Judgment (Doc. # 37) is **DENIED**.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 20th day of July, 2016.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE